# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH S. ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09 C 3406 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Deborah S. Alexander ("Plaintiff"), seeks judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying her disability insurance benefits ("DIB"). Before this Court are Plaintiff's Motion for Judgment on the Pleadings and Defendant's Cross-Motion for Summary Judgment. The parties have consented to have this Court conduct all proceedings in this case, including the entry of final judgment, pursuant to 28 USC § 636(c) and N.D. Ill. R. 73.1(c). For the reasons set forth below, this Court reverses the Commissioner's decision and remands the case for further proceedings consistent with this opinion.

# I.  Background

## A.  Procedural History

Plaintiff filed for DIB on December 7, 2006, alleging that she became disabled on November 27, 2006, due to ongoing treatment for arthritis in her left hand and spine, pancreatitis, and bad knees. (R.13, 26, 113.) The Social Security Administration ("SSA") subsequently denied Plaintiff's application on February 16, 2007, and again, upon reconsideration, on May 4, 2007. (*Id.*) Plaintiff then filed a timely request, dated May 23, 2007, for a hearing before an administrative law judge ("ALJ"). (*Id.*) That hearing took place on January 24, 2008, before ALJ Joel G. Fina ("ALJ Fina"), where Plaintiff appeared with a non-attorney representative. (*Id.*) Plaintiff testified to her work history, medical conditions, and the effect of those medical conditions on her daily activities. (*Id.* at 22–47.) James Breen, a vocational expert ("VE"), also appeared and testified at the hearing. (*Id.* at 13.)

On August 7, 2008, ALJ Fina issued a decision in which he found the Plaintiff not disabled. (*Id.* at 10.) The Appeals Council of the SSA declined Plaintiff's request to review her case, making ALJ Fina's decision the final decision of the Commissioner. (*Id.* at 3.) Plaintiff now appeals from that decision.

## B.  Factual Background

### 1.  Education and Work History

Plaintiff was born on October 18, 1956, and was fifty years old at the time of her alleged onset date. (*Id.* at 13, 25.) She is approximately five feet and two inches tall and weighs about

137 pounds. (*Id.* at 25.) She lives in Burbank, Illinois, where she has resided for the past fourteen years with her husband in a third-floor, walk-up apartment. (*Id.* at 25, 36.) Plaintiff has no minor children and possesses a ninth-grade education, with no GED or additional vocational training. (*Id.* at 24–25.)

Plaintiff has worked in two industries in the last fifteen years. First, from 1993 to 1997, she worked as a waitress. (*Id.* at 114.) Second, from 1995 to March of 2006, Plaintiff worked as a store clerk. (*Id.* at 25.) Plaintiff has not worked since her alleged onset date of November 27, 2006. (*Id.* at 26.)

### 2.  Medical History

Plaintiff's medical history consists of numerous clinical findings and progress reports dating from January 2006 to March 2008. (*Id.* at 163–368.) During this time period, the Plaintiff received treatment for the following ailments: pancreatitis;[1] Bowen's disease;[2] degenerative disc disease; disc bulging; degenerative joint disease in both knees;[3] basal joint arthritis in the left hand; medial epicondylitis in the left elbow;[4] hiatal hernia; anxiety; chronic obstructive

---

[1] Pancreatitis is an acute inflammation of the pancreas. STEDMAN'S MEDICAL DICTIONARY 294810 (Lippincott, Williams, & Wilkins,  27th ed. 2000).

[2] Bowen's Disease is a form of cancer characterized by cancerous cells on the surface of the skin. STEDMAN'S MEDICAL DICTIONARY at 63870.

[3] Degenerative joint disease is a form of arthritis characterized by degeneration of the bone and cartilage in the joint. STEDMAN'S MEDICAL DICTIONARY at 288490.

[4] Medial epicondylitis is "[a] pain syndrome caused by small tears in the tendons connected to the medial epicondyle of the humerus (a bony projection from the inner side of the
(continued...)

pulmonary disease;[5] and fracture of the right hand. (*Id.* at 163–368.) For the sake of clarity, that history is summarized below according to the names of Plaintiff's treating physicians.

### a. Dr. Venkateswara Kuchipudi

Dr. Venkateswara Kuchipudi ("Dr. Kuchipudi") treated Plaintiff for a variety of medical problems throughout 2006. She visited him a total of nine times that year and was diagnosed with the following conditions: hiatal hernia; bronchitis; chronic back pain related to degenerative disc disease at the L4-5 and L5-S1 vertebrae; annular tears and disc bulging at the L5-S1 vertebrae; pancreatitis; peptic ulcer;[6] and reflux disease. (*Id.* at 164–79.) To treat these conditions, Dr. Kuchipudi prescribed Plaintiff a number of medications, including Xanax,[7]

---

[4](...continued)
bone of upper arm). It is an overuse syndrome that is associated with golf, tennis, baseball, and other sports activities and with occupations that require repeated wrist and forearm movements. J.E. SCHMIDT, ATTORNEY'S DICTIONARY OF MEDICINE M-8863 (2009).

[5] Chronic obstructive pulmonary disease is defined as "[a]ny one of a group of diseases comprising emphysema, bronchial asthma, chronic bronchitis, bronchiectasis, and cystic fibrosis. It is marked by chronic obstruction of the bronchial tubes." ATTORNEY'S DICTIONARY OF MEDICINE at C-24840.

[6] Peptic ulcer is defined as "[a] stomach ulcer, an ulcer of the duodenum (the first part of the small intestine), or an ulcer in the lower part of the esophagus (gullet); where the mucous membrane (lining membrane) is exposed to the acid of the stomach." ATTORNEY'S DICTIONARY OF MEDICINE at P-25564.

[7] Xanax is the trade name for alprazolam, a depressant used to treat symptoms of anxiety. STEDMAN'S MEDICAL DICTIONARY at 15090.

Norco,[8] Premarin,[9] Glycolax,[10] and Nexium.[11] (*Id.* at 165–79.) Dr. Kuchipudi also referred Plaintiff to a pain management clinic, which she visited in May 2006. (*Id.* at 164.)

In addition to her visits with Dr. Kuchipudi, Plaintiff sought treatment in the emergency room three times during 2006 and 2007 for pancreatitis-related problems. Plaintiff visited the Advocate Christ Medical Center ("Christ Medical") emergency room in January 2006 and March 2006, complaining of abdominal pain, vomiting, diarrhea, and nausea. (*Id.* at 184, 193.) Plaintiff also received treatment for the same symptoms at the Palos Community Hospital emergency room in May 2007. (*Id.* at 193, 202, 342.)

---

[8] Norco is the trade name for a combination of hydrocodone and acetaminophen. It is used to treat moderate to moderately severe pain. PHYSICIAN'S DESK REFERENCE 2620-1600 (Thompson PDR 64th ed. 2010); Norco, DRUGS@FDA, http://www.accessdata.fda.gov/scripts/cder/drugsatfda/ (search for Norco; click on the Norco hyperlink entries.).

[9] Premarin is the trade name for conjugated estrogen. It is used to treat a number of conditions, including menopause-related ailments such as osteoporosis. PHYSICIAN'S DESK REFERENCE at 9040-1600.

[10] Glycolax is the trade name for polyethylene glycol 3350, a laxative used to treat constipation. ATTORNEY'S DICTIONARY OF MEDICINE at L-2970; Glycolax, DRUGS@FDA, http://www.accessdata.fda.gov/scripts/cder/drugsatfda/ (search for Glycolax; click on the Glycolax hyperlink entries.).

[11] Nexium is the trade name for esomeprazole, and it is used to treat symptoms of gastroesophageal disease, as well as other stomach ailments. PHYSICIAN'S DESK REFERENCE at 0400-2180.

b.    Dr. Luis Redondo

Dr. Luis Redondo ("Dr. Redondo"), of Midwest Orthopaedic Consultants ("Midwest

Orthopaedic"), treated Plaintiff's degenerative knee joints from November 2006 to March 2008.

(*Id.* at 329, 368.)  During that time, Plaintiff sought treatment for her knee joints at Midwest

Orthopaedic a total of ten times.  (*Id.* at 227, 241–243, 353–55, 357, 364, 368.) Dr. Redondo and

his associates diagnosed Plaintiff with the following: reduced range of motion in her leg, medial

meniscus tear in her left knee;[12] extensor tendinitis;[13] reduced Q angle of approximately

twenty-three degrees;[14] degenerative changes in the meniscus of the left knee; loose cartilaginous

bodies in both knees;[15] and "deep middle groove trochlea injury"[16] in the right knee. (*Id.* at 241.)

Plaintiff received treatment for these conditions during 2006, 2007, and 2008.  (*Id.* at 227,

353, 355, 357, 364–65, 368.)  In December  2006,  Plaintiff underwent arthroscopic surgery for

---

[12] The meniscus is "[a] crescent-shaped fibrocartilaginous structure of the knee, the acromio-and sternoclavicular and the temporomandibular joints." STEDMAN'S MEDICAL DICTIONARY at 246610.

[13] An extensor is "[a] muscle the contraction of which causes movement at a joint with the consequence that the limb or body assumes a more straight line." *Id.* at 143500. Tendinitis is inflammation of the tendon. STEDMAN'S MEDICAL DICTIONARY at 402290.

[14] The Q angle is "the angle formed by lines representing the pull of the quadriceps muscle and the axis of the patellar tendon." STEDMAN'S MEDICAL DICTIONARY at 22980.

[15] Cartilaginous loose bodies are fragments of cartilage floating free in a body cavity, such as a joint. STEDMAN'S MEDICAL DICTIONARY at 52350, 65820.

[16]A trochlea is "[a] smooth articular surface of bone upon which another glides." STEDMAN'S MEDICAL DICTIONARY at 420090.

the medial meniscus tear in her left knee, which resulted in a partial meniscectomy. (*Id.* at 227.)

Plaintiff returned to Midwest Orthopaedic in June 2007 for cortisone injections to treat further

degeneration in her knee joints. (*Id.* at 357.) Then, in September and October of 2007, Plaintiff

received four treatments of Supartz[17] injections in both knees for her elevated Q angle and joint

pain. (*Id.* at 353, 355.) Finally, although magnetic resonance imaging ("MRI") done in

January 2008 showed only minimal degeneration in both of Plaintiff's knees, a March 2008

arthroscopic surgery resulted in the removal of loose cartilaginous bodies from both knees, a total

meniscectomy of Plaintiff's left knee, and discovery of the deep middle groove trochlea injury in

the right knee, which was not treated at the time. (*Id.* at 364–65, 368.)


   c. Dr. Anton Fakhouri

  Dr. Anton Fakhouri ("Dr. Fakhouri"), also of Midwest Orthopaedics, treated Plaintiff for

advanced basal joint arthritis of the thumb and chronic medial epicondylitis of the left elbow a

total of nine times from May 2006 until May 2007. (*Id.* at 245, 251, 290, 291, 293, 356.) To

treat these conditions, Dr. Fakhouri conducted the following procedures: two cortisone injections

in May and June 2006; and surgery on the left elbow, wrist, and hand in January 2007. (*Id.* at

245, 251.) Specifically, in January 2007, Dr. Fakhouri performed a left cubital tunnel release on

---

[17] Supartz is the trade name for hyaluronic acid, which is used to treat osteoarthritis by injection into the knee joint. *Knee Pain; Smith & Nephew Partners with Randy Johnson to Raise Awareness of Osteoarthritis and SUPARTZ Joint Fluid Therapy*, PHARMA LAW WEEKLY, March 6, 2007, at 1259.

Plaintiff's left elbow and trapeziectomy on Plaintiff's left wrist, as well as a tendon interposition arthoplasty with flexor carpi radialis tendon graft. (*Id.* at 251.) These procedures involved the cutting and smoothing of bone in Plaintiff's elbow, the removal of bones from Plaintiff's wrist, and a graft of tendon tissue to Plaintiff's thumb, as well as the insertion of pins in the thumb. (*Id.* at 252.)

Plaintiff received follow-up care from January 2007 to May 2007. (*Id.* at 290, 293, 356.) Dr. Fakhouri removed the pins from her thumb in February 2007 and recommended a course of physical therapy to strengthen her left arm and hand. (*Id.* at 290, 293.) In April 2007, Dr. Fakhouri noted that Plaintiff had an "[o]verall good range of motion" with weakness in the left hand and recommended more physical therapy. (*Id.* at 291.) Dr. Fakhouri also stated that Plaintiff was "not ready to return to her fully duty" at that time, and limited her to duty "with no lifting, pulling, pushing greater than five pounds." (*Id.*) Plaintiff made an additional visit for follow-up in May 2007, at which time Dr. Fakhouri noted that she had an "overall good range of motion." (*Id.* at 356.) Plaintiff, however, complained of tenderness and weakness in her left hand, and Dr. Fakhouri prescribed an additional month of therapy for strengthening, as well as further follow-up visits. (*Id.*)

In addition to treating the above conditions, Dr. Fakhouri treated Plaintiff for a fracture to her right hand. (*Id.* at 198–99, 249.) Although Dr. Fakhouri initially limited Plaintiff to "no lifting, pushing, pulling, and carrying greater than five pounds" in April 2006, his notes from August 2006 indicate that Plaintiff recovered well and had "excellent grip." (*Id.* at 246–247.)

### d. Dr. Kenneth Bielinski

In March 2007, Plaintiff visited Dr. Kenneth Bielinski ("Dr. Bielinski") to examine a growth on her chest. (*Id.* at 307.) Dr. Bielinski excised the growth and sent it to a laboratory for analysis. (*Id.* at 307, 309.) Analysis of the tissue sample disclosed that Plaintiff had Bowen's disease, a carcinoma. (*Id.* at 307, 309.) Plaintiff subsequently had growths removed from her face and was advised to stay out of the sun. (*Id.* at 43.)

### e. Dr. John Gnap

Dr. John Gnap ("Dr. Gnap") treated Plaintiff from March 2007 to December 2007 for pancreatitis, bruising that resulted from an October 2007 motorcycle accident, and chronic obstructive pulmonary disease. (*Id.* at 323–349.) During that time, Dr. Gnap filled Plaintiff's prescriptions for Norco, Xanax, Flexeril,[18] Nexium and Advair.[19] (*Id.* at 323–27.)

---

[18] Flexeril is the trade name for cyclobenzaprine, which is used to treat muscle spasm. ATTORNEY'S DICTIONARY OF MEDICINE at C-30849-30850.

[19] Advair is the trade name for a "combination drug containing salmeterol and the corticosteroid fluticasone. It is administered by inhalation for maintenance treatment of asthma." *Id.* at A-3380.

f.      Social Security Administration Consulting
Physicians' RFC

In February 2007, Dr. David Bitzer ("Dr. Bitzer") reviewed Plaintiff's medical record for the SSA. At that time, he determined the following RFC: occasionally lift twenty pounds; frequently lift ten pounds; stand or walk about six out of eight hours in a workday; push without limitation; frequently climb ramps and stairs; occasionally climb ladders, ropes and scaffolds; frequently balance and stoop; and occasionally kneel, crouch, and crawl. (*Id.* at 280–84.) This RFC was projected for one year from Plaintiff's alleged onset date. (*Id.* at 279.) In April 2007, Dr. Henry Bernet reviewed Dr. Bitzer's RFC and affirmed it. (*Id.* at 312–13.)

### C.    **Plaintiff's Testimony**

At a hearing before ALJ Fina on January 24, 2008, Plaintiff testified to her work history, her medical conditions, and the effect of those conditions on her ability to work. (*Id.* at 22–47.) Plaintiff testified that she had not worked since her alleged onset date of November 27, 2006, and that she had left because of surgeries performed that year. (*Id.* at 22, 26.)

Plaintiff described her daily activities in detail. She stated that she could perform a number of everyday tasks, such as showering, combing her hair, and making her bed. (*Id.* at 27, 32.) Plaintiff also testified to having a driver's license and to driving a small, automatic pickup truck, as well as a motorcycle. (*Id.*) She stated that she drove the car for at most three hours at a time and did not make a trip of that length more than two or three times a year. (*Id.* at 34.)

Upon examination by her representative, Plaintiff testified to needing frequent rest stops while making the drive because she could not sit for an extended period of time. (*Id.* at 45.)

ALJ Fina asked a number of questions relating to Plaintiff's motorcycle. (*Id.* at 28–31.) Plaintiff testified that she owned an 883 Sportster motorcycle and that she had been driving it over the past year. (*Id.* at 29.) She further testified that it had a handbrake on the right side, and required the rider to change gears by shifting with her toe. (*Id.* at 30.) She also testified that the rider needed to pull in the clutch of the motorcycle with the left hand, but that it had been loosened to accommodate a woman. (*Id.* at 31.) Plaintiff estimated that she drove the motorcycle once or twice a week and had never driven it more than thirty miles. (*Id.*) She characterized her October 2007 motorcycle accident as resulting in minor bruises. (*Id.* at 28.)

When asked by ALJ Fina if she could wash dishes, Plaintiff replied that she could do so with both hands, but could not hold things in her left hand to wash them. (*Id.* at 27–28.) She stated that her husband helped her with cooking and sometimes with washing dishes. (*Id.* at 28.) Plaintiff also testified to an ability to put clothes in a washer and put them in the dryer. (*Id.* at 32.) She stated, however, that she was unable to bring the clothes up or down the third flight of stairs in her apartment building. (*Id.*)

Plaintiff also testified as to her abilities to sit, stand, and walk. (*Id.* at 35–36.) She stated that she had difficulty sitting for more than a half-hour, and that, when walking, she had to sit and take breaks frequently. (*Id.* at 35.) She also asserted that she had difficulty with balance, that she sometimes fell, and that she could not bend at the knees. (*Id.* at 36.)

When asked to describe the pain that she was currently experiencing, Plaintiff reported pain in her lower back, left hand, and left knee. (*Id.* at 37–43.) She characterized the pain in her hand and knee as a four, on a scale of one to ten, but stated that the pain in both extremities intensified when she exerted herself frequently. (*Id.* at 37–38.) She also stated that she has lower back pain and characterized it as a five on a scale of one to ten. (*Id.* at 38.)

At the time of the hearing, Plaintiff was taking Hydrocodone 10/325,[20] Xanax, Premarin, Nexium, and Flexeril.

### D.     Vocational Expert's Testimony

VE James Green also testified at the hearing. (*Id.* at 47–56.) The VE identified Plaintiff's prior work as that of a "store laborer" in the "unskilled and medium" range, and stated that Plaintiff had never made enough money to reach the significant gainful activity level. (*Id.* at 50.)

The VE then testified in response to a series of hypothetical questions posed by ALJ Fina that involved an individual with Plaintiff's "age, education, work experience, and skill set." (*Id.* at 50–56.) ALJ Fina asked the VE whether an individual with the following limitations would be able to find work in the national economy: (1) lift up to twenty pounds occasionally; (2) lift or

---

[20] This is a generic name for Norco. Norco, Drugs@FDA, http://www.accessdata.fda.gov/scripts/cder/drugsatfda/ (search for Norco; click on the Norco multiple strengths entry.).

carry up to ten pounds frequently; (3) stand or walk approximately six hours per eight-hour workday; (4) sit for approximately two hours per eight-hour workday; (5) with the option to sit or stand at will; (6) frequently handle with the left upper extremity; (7) frequently finger with the left upper extremity; (8) frequently climb ramps or stairs; (9) frequently balance and stoop; (10) occasionally crouch; (11) never crawl or kneel; (12) avoid concentrated exposure to unprotected heights; (13) avoid frequent exposure to direct sunlight. (*Id.* at 50–54.) In response, the VE asserted that a number of jobs would exist, as long as the individual was not taken off task more than ten percent of the time. (*Id.* at 56.) The VE cited 14,000 electrical accessories assembly jobs, 13,000 room service clerk jobs, and 5500 office helper jobs. (*Id.* at 52.)

### E.    The ALJ's Findings

In his August 7, 2008, decision, ALJ Fina made the following findings and conclusions of law:

1.    The claimant meets the non-disability requirements for a period of disability and disability insurance benefits as set forth in section 216(I) of the Social Security Act through December 31, 2011.

2.    The claimant has not engaged in substantial gainful activity since November 27, 2006 (20 CFR § 404.1520(b)).

3.    The claimant has the following severe impairments: left cubital tunnel syndrome, post release; relapsing pancreatitis; arthritic left hand; degenerative joint disease bilateral knees; status post motorcycle accident with multiple abrasions incurred when operating the vehicle; degenerative disc disease of the lumbar spine; and Bowen's disease ((20 CFR § 404.1520(c)).

* * * *

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Regulations No. 4 (20 CFR § 404.1520(d)).

* * * *

5.    Upon careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity (RFC) to perform light work as defined by the regulations, allowing claimant the option to sit or stand alternatively at will provided that the claimant is not taken off task more than 10% of the work period. Claimant can never climb ladders, ropes or scaffolds, kneel or crawl. Claimant can frequently climb ramps or stairs, balance, and stoop. Claimant can only occasionally crouch. Claimant can frequently handle objects (gross manipulation) with the left non-dominant upper extremity and only frequently finger (fine manipulations) with the left non-dominant upper extremity. Claimant must avoid concentrated exposure to direct sunlight. Claimant must avoid concentrated exposure to unprotected heights.

* * * *

6.    The claimant has no past relevant work (20 CFR § 404.1565).

* * * *

7.    The claimant was born on October 18, 1956 and was 49 years old on the alleged disability onset date, which is defined as a younger individual age 45–49 (20 CFR § 404.1563). She is currently 51 years old that is considered closely approaching advanced age.

8.    The claimant has a limited 9th grade education and is able to communicate in English (20 CFR § 404.1564).

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR § 404.1568).

10.     Considering the claimant's age, education, work experience, and residual
        capacity, there are jobs that exist in significant number in the national
        economy that the claimant can perform (20 CFR § 404.1560(c) and
        404.1566).

                                    * * * *

11.     The claimant has not been under a "disability," as defined in the Social
        Security Act, from November 27, 2006 through the date of this decision
        (20 CFR § 404.1520(g)).

(*Id.* at 15–19.)


## II.    **Discussion**

To qualify for DIB, a claimant must prove to the SSA that she is disabled. According to

the statute, a claimant is disabled when she has an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is unable to engage in

substantial gainful activity when her "physical or mental impairment or impairments are of such

severity that [she] is not only unable to do his previous work but cannot, considering [her] age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled under the statute, the ALJ employs a

five-step evaluation process. 20 C.F.R. § 404.1520(a)(4) (2009). At step one, the ALJ considers

whether the claimant is engaging in substantial gainful activity. *Id.* At step two, the ALJ evaluates whether an alleged physical or mental impairment is severe, medically determinable, and of sufficient duration to impair a claimant's ability to work. *Id.* At step three, the ALJ determines whether the claimant's impairments meet or equal a listed impairment. *Id.* If the claimant's impairments meet or equal a listed impairment, then the ALJ must determine the claimant to be disabled; if the impairment does not meet or equal a listed impairment, then the ALJ proceeds to step four of the analysis. *Id.* At step four, the ALJ assesses the claimant's RFC and ability to engage in past relevant work. *Id.* If a claimant can engage in past relevant work, he is not disabled. *Id.* If, however, the claimant cannot engage in past relevant work, the ALJ proceeds to step five. At step five, the ALJ assesses whether the claimant can engage in other work in light of the claimant's RFC, age, education, and work experience. *Id.*

In the case before this Court, ALJ Fina proceeded to step five before determining that the Plaintiff was not disabled. (R. 18.) At step one, he found that the Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (*Id.* at 15.) At step two, he found that the Plaintiff had severe, medically determinable, physical ailments that impaired her ability to work. (*Id.*) Nonetheless, ALJ Fina determined at step three that the Plaintiff's impairments did not meet or medically equal one of the impairments listed in the SSA regulations. (*Id.* at 16.) He then proceeded to step four, where he determined that the Plaintiff possessed the RFC to

> perform light work as defined by the regulations, allowing claimant the option to sit or stand alternatively at will provided that the claimant is not taken off task more than 10% of the work period. Claimant can never climb ladders, ropes or scaffolds,

kneel or crawl. Claimant can frequently climb ramps or stairs, balance, and stoop. Claimant can only occasionally crouch. Claimant can frequently handle objects (gross manipulation) with the left non-dominant upper extremity and only frequently finger (fine manipulations) with the left non-dominant upper extremity. Claimant must avoid concentrated exposure to direct sunlight. Claimant must avoid concentrated exposure to unprotected heights.

(*Id.* at 17.) Next, ALJ Fina found that the Plaintiff had no relevant work she could perform. (*Id.*) At step five, he determined that jobs exist in "significant number in the national economy that claimant can perform," even in light of her age, education, work experience, and RFC. (*Id.* at 19.) Thus, ALJ Fina determined that the Plaintiff was not disabled under the statute. (*Id.*)

Plaintiff challenges ALJ Fina's RFC determination, as well as his negative credibility determination of her testimony, on a number of grounds. Plaintiff makes four arguments concerning the RFC: (1) that the RFC is flawed because ALJ Fina violated his duty to develop a full and fair record; (2) that the RFC is flawed because ALJ Fina failed to consider the exertional requirements of light work in regard to Plaintiff; (3) that the RFC is inadequately explained, not based upon a review of the entire record, and, therefore, not based upon substantial evidence; and (4) that ALJ Fina "played doctor." (Pl's. Mem. Supp. J. Pleadings 6–11.) Plaintiff also makes two arguments regarding ALJ Fina's negative credibility determination: (1) that the negative credibility finding is improper because it was inadequately explained; and (2) that the negative credibility finding is not supported by substantial evidence because ALJ Fina did not review all of the evidence mandated by SSR 96-7p. (Pl's. Mem. Supp. J. Pleadings 11–13.)

This Court will affirm ALJ Fina's decision if it "is both supported by substantial evidence and based on the proper legal criteria." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing ALJ Fina's decision under this standard, this Court views the record in its entirety, but it will not re-weigh the evidence or substitute its judgment for that of the ALJ. *Id.* at 842.

In addition to the duty to base his decisions upon substantial evidence, the ALJ must also build "an accurate and logical bridge" from the evidence to his conclusions. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This "logical bridge" allows the reviewing court to evaluate the ALJ's ultimate conclusions and afford the claimant meaningful judicial review. *Scott*, 297 F.3d at 595. In doing so, the ALJ need not evaluate in writing every piece of evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2002). The ALJ, however, must explain his thinking such that is clear to the reviewing court how he reached his conclusions. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). This means that the ALJ cannot ignore an entire strand of evidence which does not support his thinking. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Rather, the ALJ must "confront [contradictory evidence] and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). If the decision does not meet these minimum requirements because it "lacks evidentiary support or is so poorly articulated as to prevent meaningful review,"

this Court will remand the case. *Brindisi ex rel Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir.

2003 (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002))).

The Court addresses each of Plaintiff's arguments below.


**A.     The ALJ's RFC Determination**

1.     <u>The ALJ's Development of the Record</u>

Plaintiff first argues that the RFC is flawed because ALJ Fina failed to develop a full and

fair record. (Pl's. Mem. Supp. J. Pleadings 8.) Plaintiff claims that ALJ Fina should not have

proceeded to a decision without ordering a medical assessment of her RFC at the time of the

hearing, particularly because Plaintiff had advised him that her surgeon planned to do additional

testing on her knees. (Pl's. Mem. Supp. J. Pleadings 7–8.) In response, the Commissioner argues

that ALJ Fina properly developed the record and reasonably determined that no further medical

consultation was necessary. (Def. Mem. Supp. M. Summ. J. 3–8.)

While the ALJ must develop a full and fair record, *Williams v. Massanari*,

171 F. Supp. 2d 829, 833 (N.D. Ill 2001), this Court will determine that the ALJ inadequately

performed this duty only when there are significant gaps in the claimant's medical record. *Nelms

v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *see* 20 C.F.R. § 404.1519a(b) ("A consultative

examination may be purchased when the evidence as a whole, both medical and nonmedical, is

not sufficient to support a decision on your claim."). An omission is significant only when it is

prejudicial. *Id.* To prove prejudice, the claimant must set forth specific, relevant facts that the ALJ did not consider. *Id.*

In light of this standard, ALJ Fina was under no affirmative duty to acquire a medical RFC of the Plaintiff at the time of the hearing. *See Nelms*, 553 F.3d at 1098. There are no significant gaps in the medical record regarding Plaintiff's conditions. The record shows that ALJ Fina considered the possibility that Plaintiff would have additional knee surgery. ALJ Fina gave Plaintiff twenty-eight days after the hearing to submit any evidence that might bear on her claim. (R. 56–57.) If Plaintiff thought that she needed more evidence to prove her functional limitations, then she should have submitted evidence at that time. 20 C.F.R. § 404.1512(a), (c) ("In general, [the claimant has] to prove to [the SSA] that [she is] blind or disabled . . . . [She] must provide medical evidence showing that [she has] an impairment(s) and how severe it is during the time [she says] that [she is] disabled."). On these facts, ALJ Fina satisfied his duty to develop the record.

> 2.  The ALJ's Consideration of Plaintiff's Ability to Perform
>     Light Work

Plaintiff next argues that the RFC is flawed because ALJ Fina failed to consider the exertional requirements of light work in making his determination. (Pl's. Mem. Supp. J. Pleadings 9–10.) Specifically, Plaintiff contends that ALJ Fina failed to assess Plaintiff's ability to lift objects and stand or walk for six out of eight hours of the day in light of her hand and knee

surgeries. (Pl's. Mem. Supp. J. Pleadings 9–10.) In response, the Commissioner argues that ALJ Fina properly reviewed the evidence in determining the RFC. (Def. Mem. Supp. M. Summ. J. 3–8.)

When determining a claimant's ability to meet the demands of work, the ALJ must consider "the testimony of claimant as well as supplemental sources of information, such as the United States Department of Labor's Dictionary of Occupational Titles." *Schroeter v. Sullivan*, 977 F.2d 391, 394 (7th Cir. 1992). The ALJ fails in this duty where he makes contradictory findings. *Allen v. Sullivan*, 977 F.2d 385, 389–390 (7th Cir. 1992). In *Allen*—which Plaintiff cites in support of this argument—the ALJ determined that the plaintiff's testimony regarding his inability to sit for extended periods of time was credible, and concluded that the plaintiff could not sit for an extended period of time. *Id.* at 389–390. In determining the plaintiff's RFC, however, the ALJ in *Allen* also found that the plaintiff could do light work, which requires an ability to stand or walk for six out of eight hours of the day. *Id.* at 390. This contradiction led the *Allen* court to conclude that the RFC was not based on substantial evidence, and that the ALJ failed to consider the exertional requirements of light work. *Id.*

No similar contradiction exists in this case. ALJ Fina considered Plaintiff's testimony and found her to not be credible in regard to the extent of the difficulty she experienced bending her knees and lifting objects with her hands. (R. 17.) He then determined her capable of light work based upon the testimony of the VE. ( *Id.* at 17, 48–54.) There is no contradiction between ALJ Fina's credibility findings and his RFC determination that indicates he failed to consider

Plaintiff's ability to do light work. In addition, the imposition of a sit or stand option in the RFC indicates that ALJ Fina considered the Plaintiff's ability to meet the standing and walking requirements of light work. (*Id.*) ALJ Fina had the right to review the evidence and, following the rules and regulations of the SSA, accord it an appropriate weight. He did not commit error by weighing the evidence differently than Plaintiff.

### 3. The ALJ's Duty to Examine the Record and Explain His Decision

Plaintiff also argues that the RFC is flawed because ALJ Fina failed to assess all of the evidence in the record and failed to adequately explain the evidentiary basis for his decision. (Pl's. Mem. Supp. J. Pleadings 11.) In response, the Commissioner argues that ALJ Fina adequately evaluated the evidence and explained his decision. (Def. Mem. Supp. M. Summ. J. 3–8.)

The ALJ must examine the entire record to construct an RFC and confront evidence that does not support his determination. *Kasarsky*, 335 F.3d at 543; *Zurawski*, 245 F.3d at 888. ALJ Fina discussed the findings of Plaintiff's January 2008 MRI, which showed no significant damage to her knees, but failed to discuss the results of Plaintiff's March 2008 knee surgery, which directly contradicted the MRI results. (R. 17, 364–65, 368.) Indeed, ALJ Fina omitted the March 2008 surgery from his recitation of Plaintiff's medical history. (*Id.* at 15.) Thus, it appears that ALJ Fina did not consider this evidence at all. His omission prevents this Court from

following his reasoning and does not assure us that he considered all of the relevant evidence.

*Godbey v. Apfel*, 238 F.3d 803, 807–08 (7th Cir. 2000).

In addition, ALJ Fina should have explained his view of the medical record in a way that would allow this Court to trace his reasoning. *Blakes*, 331 F.3d at 569. His discussion of the medical record is brief and made for the sole purpose of supporting his negative credibility determination of Plaintiff. ALJ Fina wrote that

> [t]he claimant's allegations are not supported by the medical record as a whole. X-rays/MRI showed minimal degenerative changes. January 2008 MRI of right knee was normal. Her treating physician limited her to light duty with no restriction in walking, sitting, or standing and claimed she could only lift 5 pounds, but only a temporary restriction; she had a good postoperative course, and surgery was effective with no complaints thereafter.

(R 17.) This paragraph, which represents the entire discussion of the medical record in ALJ Fina's decision, is inadequate to serve the function of providing an "accurate and logical bridge" between his ultimate conclusion and the evidence in the record. Because he concluded that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but also concluded that she was not "entirely credible," ALJ Fina was required to explain this inconsistency through a logical examination of the medical evidence. *Lewis v. Astrue*, 518 F. Supp. 2d 1031, 1042 (N.D. Ill. 2007); (R. 17).

The paragraph cited above is a jumble of facts lifted from the record lacking the required discussion. While the ALJ may make reasonable inferences based on all of the evidence, he must also explain these inferences when resolving contradictions in the record. Here, for example,

ALJ Fina referred to the "5 pound" restriction Dr. Fakhouri placed on Plaintiff as "temporary," but did not discuss how he viewed the fact that Dr. Fakhouri's last progress note indicates that she required more therapy for strengthening of her left hand. (R. 17.) Nor did he discuss the fact that Plaintiff continues to take pain medication and muscle relaxants. (*Id.* at 17.) Therefore, ALJ Fina failed to adequately review the evidence and explain his decision.

### 4.    The ALJ's Duty to Avoid "Playing Doctor"

Lastly, Plaintiff argues that the RFC is flawed because ALJ Fina "played doctor" when he rejected the medical opinion evidence in the record. (Pl's. Mem. Supp. J. Pleadings 7–8.) In response, the Commissioner argues that ALJ Fina's determination is based on substantial evidence in the record. (Def. Mem. Supp. M. Summ. J. 3–8.)

ALJs "play doctor" when they fail to address relevant medical evidence and substitute for evidence their own assertions about the claimant's condition. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001); *Armstrong v. Barnhart*, 287 F. Supp. 2d 881, 885–886 (N.D. Ill. 2003). This does not mean that the ALJ must accept the medical opinion evidence in the record to determine a claimant's RFC. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). If, however, the ALJ rejects such evidence, he must explain how he made his RFC determination with specific citations to the record that show he considered the relevant medical and non-medical evidence. *Bailey v. Barnhart*, 473 F. Supp. 2d 842, 849–851 (N.D. Ill. 2006).

In this case, ALJ Fina failed to address relevant medical-opinion evidence in the record. As the Commissioner points out, ALJ Fina was free to give little weight to the RFC determination of the consulting physicians, and to discount Dr. Fakhouri's decision to limit the Plaintiff to lifting no more than five pounds as "temporary." (Comm. Mem. Supp. M. Summ. J. 4); *see Schmidt*, 496 F.3d at 845. At that point, however, ALJ Fina was under a duty to provide adequate citation to the record in support of the RFC he constructed. *Bailey*, 473 F. Supp. 2d at 849–851. He did not do that. As noted above, ALJ Fina (1) did not review the entire record in determining Plaintiff's RFC and (2) did not adequately explain the reasoning that led to his conclusion. *See Dixon*, 270 F.3d at 1177–78 ("The cases in which we have reversed because an ALJ impermissibly 'played doctor' are ones in which the ALJ failed to address relevant evidence."). Therefore, ALJ Fina failed to adequately support his RFC and improperly "played doctor." *Dixon*, 270 F.3d at 1177–1178; *Bailey*, 473 F. Supp. 2d at 850–851.

Upon remand, ALJ Fina must consider all the relevant evidence in the record and confront the evidence that does not support his RFC determination by stating the reasoning that he used to resolve any evidentiary conflicts. If he finds that, after weighing all the evidence,[21]

---

[21] The Court notes that it need not order further medical examination of the Plaintiff simply because it has concluded that the ALJ impermissibly "played doctor." *See Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Hayes v. R.R. Ret. Bd.*, 966 F.2d 298, 304 (7th Cir. 1992). In *Bailey v. Barnhart*, which Plaintiff cites to support the contrary proposition, the reviewing court determined that the ALJ (1) rejected the RFC assessments in the record and (2) found the remainder of the evidence in the record to be ambiguous. 473 F. Supp. 2d at 833–835. At that point, regulations required the ALJ to flesh out the record rather than construct
(continued...)

more evidence is necessary to determine Plaintiff's functional limitations, he must call a medical

consultant to examine the Plaintiff and provide a RFC evaluation.


### B.    The ALJ's Credibility Determination

Plaintiff further argues that ALJ Fina failed to support his credibility determination with

substantial evidence and to consider all relevant evidence in the record as mandated by Social

Security Ruling 96-7p. SSR 96-7p ("In determining the credibility of the individual's statements,

the adjudicator must consider the entire case record . . . ."); (Pl.'s Mem. Supp. J. Pleadings

11–13). The Commissioner, in response, argues that ALJ Fina's determination is based upon

substantial evidence. (Comm. Mem. Supp. M. Summ. J. 8–10.)

Because the ALJ is in the best position to evaluate the truthfulness of the claimant, this

Court will overturn a determination only if it is "patently wrong," meaning that it lacks any

explanation or evidentiary support. *Elder v. Astrue*, 529 F.3d 408, 413–414 (7th Cir. 2008);

---

[21](...continued)
a "middle-ground" RFC without citation at all. *Bailey*, 473 F. Supp. 2d at 838–830; *see also Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994); 20 C.F.R. § 404.1527(c)(3) ("If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence . . . .").

The facts of the instant case are different from those in *Bailey*. Here, ALJ Fina failed to evaluate and discuss all of the relevant evidence. Thus, this is not a case where, as in *Bailey*, the ALJ weighed contradictory evidence and chose an impermissible method for resolving the conflict. Rather, ALJ Fina failed to confront the contradictory evidence entirely. In other words, he did not weigh the evidence at all, so 20 C.F.R. § 404.1527 cannot yet require him to seek additional evidence.

*Skarbek v. Barnhart*, 390 F.3d 500, 504–505 (7th Cir. 2004) (quoting *Zurawski*, 245 F.3d at 887). SSR 96-7p, nonetheless, requires the ALJ to base his determination upon the entire record and be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

Here, ALJ Fina has failed to adequately discuss the evidence in the record according to SSR 96-7p. While ALJ Fina cited portions of Plaintiff's testimony concerning her limitations, as well as portions of Plaintiff's testimony concerning her daily activities, ALJ Fina did not explain how these portions of her testimony are inconsistent. (R. 17.) It is not clear how Plaintiff's ability to conduct certain household tasks, or to occasionally drive a car or ride a motorcycle, is inconsistent with her reports of pain and weakness in her hands, knees, and back. (*Id.* at 17, 37–38.) The medical record discloses evidence of extensive surgery on Plaintiff's left hand, as well as multiple surgeries on Plaintiff's knees. (*Id.* at 251–52, 241, 365.) The record also indicates that Plaintiff was diagnosed with chronic back pain related to degenerative disc disease. (*Id.* at 17, 164.) Having the ability to perform tasks sporadically is not the same as having the ability to perform tasks on an eight-hour-a-day, five-day-a-week basis. *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). Furthermore, the ability to perform minimal daily activities does not necessarily contradict claims of disabling symptoms, such as pain or weakness, and ALJ Fina should have explained these perceived inconsistencies "to make clear to the individual and

to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski*, 245 F.3d at 887; *see* SSR 96-7p.

Additionally, ALJ Fina failed to consider the entire record in making his determination, as SSR 96-7p requires. "[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings . . . ." SSR 96-7p. In evaluating the Plaintiff's testimony concerning pain in her legs, ALJ Fina noted that the January 2008 MRI of Plaintiff's left knee showed "minimal degenerative changes," and that the right knee was "normal." (*Id.* at 17.) ALJ Fina did not, however, discuss the March 2008 arthroscopy performed on Plaintiff's knees and the problems it disclosed in both of her knee joints. (*Id.* at 365, 368.) These medical findings are exactly the kind of evidence that SSR 96-7p requires ALJs to consider. As has been noted several times, ALJ Fina's recitation of the Plaintiff's medical record omits this event entirely. (*Id.* at 15–16.) Although ALJ Fina need not evaluate every piece of evidence in writing, there is no indication he considered the March 2008 arthroscopy at all. As a result, he did not satisfy the basic requirements of SSR 96-7p.

Upon remand, ALJ Fina must re-examine the alleged inconsistencies between the Plaintiff's testimony and the medical record, explain the nature of the inconsistencies, and address the relevant evidence in the record.

### III.  <u>Conclusion</u>

For the reasons stated above, this Court reverses ALJ Fina's decision. Upon remand, he must consider all the medical and non-medical evidence in the record when reconstructing both his RFC of Plaintiff and his credibility determinations.  He must also explain how he resolved contradictions in the evidence to support his determinations.  In addition, if he finds that, after considering and resolving the contradictions, he cannot determine the Plaintiff's RFC based on the medical evidence at hand, he must call a medical expert in to review the Plaintiff's records and provide an assessment of her functional limitations..

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** August 10, 2010.